## FARMERS LOAN & TRUST COMPANY v. SOUTH-ERN SURETY COMPANY, Appellant.

### Division One, December 30, 1920.

1. **PLEADING: Indemnifying Bond: Larceny: General Allegations: Waiver.** In a suit by a loan company on a bond given by a surety company agreeing to pay the loan company such pecuniary loss, not exceeding ten thousand dollars, as it might sustain by any act of larceny or embezzlement committed by its president, an objection on appeal that the facts upon which the claim of larceny and embezzlement is predicated are not sufficiently set forth in the petition is immaterial after verdict; for, a failure to demur constituted a statutory waiver of the objection that each act of the alleged larceny should have been stated in a separate count, and a general allegation of the ultimate fact that the alleged loss resulted from acts of larceny and embezzlement amounts to a statement of a good cause of action, even if defectively stated.

2. **INDEMNIFYING BOND: Employee: Personal Dealings With Employer: Selling Forged Notes.** Where by its idemnifying bond the surety company agreed to pay to a loan company such pecuniary

loss, not exceeding ten thousand dollars, as the loan company should sustain by any act of larceny or embezzlement committed by its "employee, while acting as president, in the employ of" said loan company, and one of the official duties of the president was to countersign all checks upon the funds of the trust company, so that without his official signature no part of such funds could be withdrawn, and in that capacity he signed a check and took money from the funds of the company, which he appropriated to his own use, and for the purpose of obtaining the signature of the secretary, which also was necessary to enable him to abstract the company's money then in possession of the bank, he forged notes of the same amount and a deed of trust, even the Recorder's certificate, asserting, by their presentation to the secretary, that they were genuine instruments, and indorsed the forged notes in blank "without recourse" and delivered them to the secretary, his acts resulting in the loss to the loan company were those of its "employee" and bore such a legal relation to his duties as president, and to his employment, as to make the surety liable, and were not transactions between the trust company in its corporate capacity on the one side and the said president, acting for himself and as an individual, on the other.

3. ———: **Larceny: Uttering Forged Notes: Trick.** If a person, with a preconceived design to appropriate money to his own use, obtain possession of it by means of fraud or trickery, the taking amounts to larceny, the fraud or trick being equivalent to a trespass. So that where the bond obligated the makers to pay to a loan company any money lost by any act of larceny of its president, his forgery of the name of the owner of real estate to notes and to the deed of trust securing the same and of the Recorder's certificate thereto, and the presentation of them to the secretary of the company, whose signature to a check it was necessary to obtain in order that he might cash the check, and the obtaining or taking by these methods of the company's money equal in amount to the forged notes and appropriating it to his own use, amounted in law to larceny, and make the surety liable upon the bond. And the criminal scheme is further established by the fact that the president used the secretary as his innocent and unsuspecting tool.

4. ———: ———: **Obtaining Valid Check: Trick.** The president of a loan company represented to its secretary that he had arranged for an exceedingly good loan to a named person (who afterwards proved to be a mere dummy), a part of which must be immediately advanced, and that he would bring in the papers in a day or two and receive the remainder. The secretary drew a check payable to such dummy against the company's funds, and it was counter-

signed by the president and secretary, which was necessary to make it valid. The president indorsed the name of the payee on the check and was paid the money by the bank. The loaning of money without the recorded approval of the board of directors was expressly forbidden by the laws regulating the company, and an advancement to the said payee would have been in violation of the duties of both the president and secretary. *Held*, that the indorsement of the name of the said payee on the check was a minor incident, but the abstraction of the company's money by means of an apparently valid check was the crime, and it consisted of taking and appropriating the money by means of a trick and fraud, and was larceny as defined in the statutes.

5. ———: **Timely Notice.** When sued on a bond by which the surety agreed to pay a loan company the amount of loss arising from the larceny or embezzlement of its president, the defense that the company did not "immediately and in any event within ten days after the discovery" of the crime notify the surety, as required by the bond, is affirmative, and requires evidence to establish it; and where the company two days after the president's sensational death wrote the company that a careful investigation was in progress and showed apparent irregularities and that claim would be made for such of them as came within the provisions of the bond, and the investigation proceeded for eleven days until the loss was established, the surety being constantly notified by letter of its progress, and demand was made within the ninety days required, the notice was timely enough.

6. **APPELLATE PRACTICE: Judgment For Right Party: Error in Instructions.** The infallible test on appeal is whether the judgment of the trial court, upon the entire record, was for the right party. If under the pleadings and evidence the verdict and judgment could not lawfully have been otherwise, they must stand, notwithstanding infirmities in the instructions. General assignments that the instructions for respondent submitted the construction of the contract sued on, or that they permitted the jury to wander over fields outside the issues, call for examination of the instructions only to the extent of ascertaining whether in giving them the trial court committed error materially affecting the merits of the action.

7. **IDEMNIFYING BOND: Larceny: Civil Action.** An action on a bond guaranteeing a loan company against loss by the larceny of its president is a civil action, and in determining whether he was guilty of larceny the rules relating to evidence in civil cases must be applied.

8. ———: ———: ———: **Judgment for Right Party.** In a suit on a bond which made the defendant surety liable if the plaintiff

sustained loss by the larceny of its president, wherein defendant rested its entire defense upon the theory that the president's acts constituted the felonious obtaining of money by false pretense or forgery, and to make that defense so obvious and plain that the jury would not be called upon to consider it as a question of fact, counsel for defendant made certain admissions, in which plaintiff's counsel acquiesced, and those admitted facts establish larceny and the judgment was therefore for the right party, general assignments that plaintiff's instructions submitted the construction of the contract sued on, and permitted the jury to wander over fields outside the issues in search for misconduct on the part of the president, raise questions which do not materially affect the merits of the action.

9. ————: Larceny of Deceased Principal: Competency of Secretary as Witness. Where all the material facts pertaining to the main issue in the suit on an idemnifying bond given to a loan company by its president were admitted by defendant surety at the trial, whether the company's secretary, being plaintiff's official agent and interested as a stockholder, was a competent witness, the president being dead, is immaterial.

Appeal from Jackson Circuit Court.—*Hon. Thomas B. Buckner,* Judge.

Affirmed.

*Morrison, Nugent & Wylder* and *Howard L. Hassler,* for appellant.

(1) The court erred in refusing to give defendant's demurrer to the evidence. The bond provided against acts of larceny or embezzlement and the alleged breaches were not that character of wrong doing. (2) The court erred in submitting the James T. Robinson (O'Connell) transaction to the jury. That transaction involved a straight case of forgery, and is not within the scope of appellant's bond, which by its express terms limits its liability to loss by reason of any act or acts of larceny or embezzlement. Furthermore the forgery was a personal act in Peltzer's individual capacity and not in connection with his duties or acts as president of the Trust

Company. It did not come within the limitation of the bond which covered only "acts of larceny or embezzlement *while as president.*" Bank v. Guaranty & Trust Co., 133 Mo. App. 705; Guarantee Co. v. Mechanics' Bank & Trust Co., 100 Fed. 559; Trust Co. v. National Surety Co., 221 Fed. 618; Dedham Bank v. Chickering, 4 Pick. (Mass.) 314; Trust Co. v. Overstreet, 84 S. W. (Ky.) 764. (3) The court erred in submitting the Rapschutz transaction to the jury. That transaction was a plain case of uttering a forged instrument—a note and deed of trust. It was not an act of larceny or embezzlement and was a transaction wherein Peltzer was a seller, and the trust company a buyer of securities. It was not an act of Peltzer "while as president." Home Savings Bank v. Traube, 6 Mo. App. 232; Trust Co. v. Overstreet, 84 S. W. (Ky.) 764; Brown Grocery Co. v. Wasson, 113 Ky. 414, 68 S. W. 404; Ins. Co. v. Johnson, 120 Ill. 622; Ins. Co. v. Lowenberg, 120 N. Y. 44. (4) The court erred in permitting a recovery on the $3,250 transaction. This was money drawn out of the funds of the trust company without concealment and in accordance with Peltzer's previous custom of securing advances from the company, which in this instance, as in previous cases, were used by him in his personal business. It was neither larceny nor embezzlement and was not so considered or treated by the trust company or its officers. Coyle v. U. S. Fidelity & Guaranty Co., 217 Mass. 268; Gray v. Davis, 89 Mo. App. 450; Milwaukee Theater Co. v. F. & C. Co., 60 N. W. (Wis.) 360; Fire Ins. Co. v. Nelson, 157 S. W. (Tenn.) 416; Brown Grocery Co. v. Wasson, 68 S. W. (Ky.) 404; Blair v. Ins. Co., 10 Mo. 355; Ins. Co. v. Johnson, 120 Ill. 622; Insurance Co. v. Lowenberg, 120 N. Y. 44. (5) Failure to give notice of Peltzer's defalcations within the time required by the bond precludes recovery. No notice of any act of Peltzer or of any act for which recovery is sought, was given to appellant until after Peltzer's death and after more than sixteen days after full knowledge there-

of by the respondent and its officers. This was a clear breach of the condition in the bond which is there stated to be precedent to recovery, and which condition required "immediate notice," or "in any event within ten days." This failure precluded any recovery by respondent. Dominion Trust Co. v. National Surety Co., 221 Fed. 618; Hurley v. Fidelity Co., 95 Mo. App. 88; U. S. Fid. & Guar. Co. v. Carmichael Co., 195 Mo. App. 93; Mich. Gar. & Loan Assn. v. Trust Co., 73 Mo. App. 161; Irwin v. Ins. Co., 24 Mo. App. 151; Burnham v. Ins. Co., 75 Mo. App. 394; La Force v. Ins. Co., 43 Mo. App. 527; National Surety Co. v. Long, 125 Fed. 887; U. S. Fid. & Guar. Co. v. Rice, 148 Fed. 206. (6) The court erred in admitting evidence as to transactions with the deceased, Peltzer. The great bulk of plaintiff's evidence consisted of dealings between Peltzer as an individual on the one side, and the agents, officers and directors of respondent, respresenting respondent company, on the other side. Under Sec. 635, R. S. 1909, and the decisions, such agents, officers, directors and stockholders were incompetent to testify with reference to transactions between them as representatives of the company and Peltzer. Under the authorities the surety is entitled to the same protection as the personal representative of the deceased principal. Lead & Zinc Inv. Co. v. Lead Co., 251 Mo. 742; Leavea v. Southern Ry. Co., 266 Mo. 151; Leavea v. Railroad, 171 Mo. App. 24; State ex rel. Bryant v. Morris, 69 N. C. 448; McGowan v. Davenport, 134 N. C. 526; Banking House v. Rood, 132 Mo. 261; Chapman v. Dougherty, 87 Mo. 617; Looker v. Davis, 47 Mo. 140. (7) Plaintiff's first instruction is erroneous. (a) Because it is not confined to the charges alleged in the petition. By telling the jury that the bond covered "any loss" by "the act" of Peltzer, the jury were given a roving commission and were not confined to the issues raised by the pleadings or supported by the evidence. State ex rel. Coal Co. v. Ellison , 270 Mo. 645; Beave v. Transit Co., 212 Mo. 331; Tinkle v. Railroad, 212 Mo. 471; Black

v. Met. St. Ry. Co., 217 Mo. 672; Priebe v. Crandall, 187 S. W. (Mo.) 605; Degonia v. Railroad, 224 Mo. 589, Mansuh v. Botts, 80 Mo. 658; Bank v. Murdock, 62 Mo. 70. (b) The instruction assumes the existence of act or acts of larceny or embezzlement. To tell the jury that the bond covered "the act or acts of larceny or embezzlement committed by Peltzer," and to proceed to say that "if you believe defendant was duly notified of the wrongful acts of said Peltzer" was to assume that there were wrongful acts of Peltzer which came within the purview of the bond. To thus assume the principal issue was prejudicial error. Gessley v. Mo. Pac. Ry. Co., 26 Mo. App. 160; Phillips v. Todd, 180 S. W. (Mo.) 1039; Ganey v. Kansas City, 259 Mo. 654; Lamport v. General Acc. Co., 272 Mo. 39; Meily v. Railroad, 215 Mo. 586; State v. Davies, 80 Mo. App. 239; Warrington v. Bird, 168 Mo. App. 385. (c) The construction of the contract is for the court and not for the jury. The instruction telling the jury that if they believed defendant was "duly notified of the wrongful acts of Peltzer," left the construction of the condition precedent as to giving notice of Peltzer's acts to the arbitrary notion of the jurors. Evans v. Graden, 125 Mo. 79; Edwards v. Smith, 63 Mo. 119; Caldwell v. Dickson, 26 Mo. 60; Bank of Freeport v. Railroad, 172 Mo. App. 678; Mount v. Implement Co., 195 Mo. App. 21.

*Sparrow & Patterson, James R. Page* and *Humphrey, Boxley & Reeves* for respondent.

(1) Peltzer was guilty of acts of larceny and embezzlement. As president of respondent he was an executive officer, and the affairs of said corporation were in his charge. By certain manipulation he got a check for $3250 during the absence of the secretary, and by the same methods he obtained and cashed checks aggregating $4500 on account of Matt O'Connell mortgage, which was admitted to be a forgery, and he obtained the money, treated it as his own, and con-

verted it to his own use, according to the testimony and the admissions. Sec. 4550, R. S. 1909. Inducing an owner of a chattel or of money by fraudulent trick or devise, and with felonious intent to part with the possession, and then appropriating the thing or money to one's own use against the owner's consent, is larceny. Huber v. State, 57 Ind. 341. Larceny may exist though possession of the stolen goods is obtained with the owner's consent, if the consent is obtained by deception, and with the intent not to return the goods, but to appropriate them, and to deprive the owner of a remedy for this loss. Fleming v. State, 136 Ind. 149. If the owner of goods parts with the possession for a particular purpose, and the person who receives the possession avowedly for that purpose had a fraudulent intention to make use of that possession as the means of converting the goods to his own use, and does so convert them, it is larceny. Elliott v. Commonwealth, 75 Kent. 176; Commonwealth v. Wilde, 71 Mass. 83; Commonwealth v. Lannan, 153 Mass. 287; Loomis v. People, 67 N. W. 322; Kelley v. People, 6 Hun, 509; Macino v. People, 12 Hun, 127; Devore v. Territory, 2 Okla. 562; Commonwealth v. Eickleberger, 119 Pa. 254; 3 Greenleaf on Evidence, sec. 160; 1 Bishop, Crim. Law, sec. 583. (2) The court did not err in submitting the James T. Robinson (O'Connell) transaction to the jury. According to the admitted facts Peltzer obtained the checks in the O'Connell matter by deception, and by a trick, and by fraud, and, therefore, according to all the authorities cited above the question should have been submitted to the jury. Peltzer not only did these things as president, but while acting as president. Whatever else may be said, Peltzer while president of respondent, by a trick, by artifice, by fraud and by deception, obtained two checks aggregating $4500, cashed them, used the money, and the respondent was out that much money on account of the transaction. There was no suggestion of purchase and sale in the transaction, and even if there

had been a straight out purchase of said bogus paper, the fact remains that, according to the admitted facts, Peltzer practiced a deception as president to obtain the funds of respondent. 4 Joyce on Ins. (2 Ed.), p. 4617, sec. 2766, par. F. Undoubtedly Peltzer was guilty of such acts as would have subjected him to a criminal prosecution for larceny or embezzlement, but respondent was entitled to recover even if such acts were not such as to subject him to an indictment and conviction for larceny or embezzlement. 19 Cyc. 518. (3) The court did not err in submitting the Rapschutz transaction to the jury. As in the case of the check and the O'Connell matter, this was a plain case of the employment by Peltzer of fraud, and a trick, and an artifice in his position as president of respondent, for his own use and benefit. It is admitted that every act of the said Peltzer was wrongful, fraudulent and criminal; that he obtained the money by forgery, treated it as his own, and appropriated it to his own use while as president of respondent. His acts were those of both larceny and embezzlement, and this matter was properly submitted to the jury. (4) The court did not err in permitting a recovery on the $3250 transaction. This money was drawn out under circumstances which in the light of subsequent developments clearly point out the original purpose of Peltzer. It was not the custom of Peltzer thus to draw out and use funds of the corporation in his own behalf. When the transaction was discovered, the secretary called on Peltzer in relation thereto and obtained a check from him, but this check was issued upon a bank where there were no funds, and from day to day Mr. Louis indulged Peltzer because assured that the check would be made good, and while the whole matter was pending, Peltzer died. All the authorities hereinbefore cited approve respondent's right of recovery on the grounds that this was a repetition of the secretive and fraudulent methods employed by Peltzer to obtain money from the respondent for the

purpose of appropriating the same to his own use. (5) There was no failure on the part of respondent to give notice of Peltzer's peculations. Hartford Fire Ins. Co. v. Casey, 196 Mo. App. 296; St. Charles Bank v. Denker, 205 S. W. 216; State, to use v. Atherton, 40 Mo. 216; Bank of Deepwater v. Ogden, 192 Mo. App. 247; Harrison v. Ins. Co., 8 Mo. App. 37. Even if respondent did not notify the appellant within the time provided in its contract, which we do not concede, then appellant is estopped to set up such failure for that it made extensive investigations and examinations into the affairs of respondent and put respondent to an immense amount of inconvenience and trouble. The rule is that it should have stood on this question, and having failed to do so, it waived its rights. Meyers v. Ins. Co., 123 Mo. App. 682; Pace v. Ins. Co., 173 Mo. App. 505; Chandler v. Ins. Co., 180 Mo. App. 400; Keeton v. Ins. Co., 178 Mo. App. 308; McCullough v. Ins. Co., 113 Mo. 606; Boppart v. Ins. Co., 140 Mo. App. 675; Roark v. Surety Co., 130 Mo. App. 401. (6) The court did not err in admitting evidence as to transactions with the deceased Peltzer. Such testimony was admitted upon two grounds: (a) Because the transaction was tainted with fraud and a tortious and felonious act; and therefore the rule did not apply. Bajhor v. Bajhor, 184 S. W. 76; Freeland v. Williamson, 220 Mo. 231; Jones on Evidence, sec. 774; Lieber v. Bank, 137 Mo. App. 174; Wagner v. Binder, 187 S. W. 1159. (b) Because under the law, all the witnesses testifying were competent. Wagner v. Binder, 187 S. W. 1155; Clark v. Thias, 173 Mo. 628. The case of Banking House v. Rood, 132 Mo. 261, chiefly relied upon by appellant, was expressly overruled in the case of Wagner v. Binder, 187 S. W. 1158. (7) Plaintiff's first instruction is correct. "The specific admissions of the answer, coupled with the failure to deny, by general denial or otherwise, the averments of the petition stating a cause of action on the bond, left nothing to be submitted to the

jury except the special defenses asserted.'' Police Reilef Assn. v. American Bonding Co., 197 Mo. App. 444. In the case at bar appellant never denied the allegations of respondent's petition, and as it offered no defense whatever, the allegations of the petition stand confessed by the answer. Boles v. Bennington, 136 Mo. 522; K. C. Hotel Co. v. Sauer, 65 Mo. 279.

BROWN, C.—The plaintiff is a trust company organized and doing business under the laws of this State, in Kansas City, Missouri.

The defendant and appellant is a fidelity insurance company organized and incorporated under the laws of Oklahoma, and doing business in this State under a license issued in conformity with the provisions of our statutes relating to insurance.

This is an action upon a bond by which the defendant undertook and agreed to pay to the plaintiff, as employer of Theodor C. Peltzer in the capacity of its president, ''such pecuniary loss, not exceeding ten thousand dollars as the employer shall sustain, of money or other personal property, by reason of any act or acts of larceny or embezzlement on the part of Theodor C. Peltzer, hereinafter called the employee, while as president in the employ of said employer, and during the period commencing July 1, 1915, and ending with the termination of this bond.''

After stating the obligation of the bond or policy as above, the petition charges:

''That after the execution and delivery of said bond or policy of insurance and while same was in full force and effect, the plaintiff sustained pecuniary loss of money, and other personal property by the reason of acts of larceny and embezzlement committed and done by the said Theodor C. Peltzer, the insured under, and principal in, said bond or policy of insurance, which said acts of larceny and embezzlement consist of the following to-wit:

"On September 11, 1915, the said Peltzer, as president of plaintiff, wrongfully and larcenously abstracted and drew from the funds of said plaintiff the sum of $3,250, which at the time was obtained without authority and such sum appropriated and converted by the said Peltzer to his own use.

"On August 10, 1915, the said Peltzer abstracted and withdrew from the treasury of the plaintiff the sum of $4,500 and substituted therefor a certain worthless and bogus security and note designated as the 'O'Connell mortgage,' and appropriated and converted the funds thus abstracted to his own use. . . .

"On August 13, 1915, the said Peltzer wrongfuly abstracted and withdrew from the treasury of the plaintiff the sum of $7,016.33 and substituted therefor a fraudulent and bogus security designated as the 'Rapschuts mortgage,' and which said sum he appropriated and converted to his own use."

Four other instances of alleged larcenous abstraction of money from the plaintiff are stated, but were withdrawn from the jury at the trial and therefore not involved in this appeal. The petition then proceeds:

"Plaintiff further states that all of the above and foregoing acts of the said Theodor C. Peltzer were acts of larceny and embezzlement and were committed and done without authority and without the knowledge or consent of the board of directors of said plaintiff, and with the purpose and design wrongfully and fraudulently to convert and appropriate such moneys and other property to his own use and benefit, and by reason whereof defendant became obligated to pay plaintiff the full amount of said bond or policy of insurance."

It also pleads immediate notice to the defendant upon the discovery of the abstraction of funds in each case, in all respects as provided in the instrument sued on, accompanied with a demand for payment and refusal to pay after a full examination accorded to defendant upon its demand therefor.

The defendant answered, admitting the execution of the instrument sued on, as well as the relation of the parties with reference thereto, and denying the acts of larceny and embezzlement charged. As affirmative defenses it alleged that all sums which might have been taken by Peltzer in the several transactions were taken with the knowledge and consent of the plaintiff or were afterward adopted and ratified. It also pleaded failure on the part of plaintiff to perform the several conditions of the bond with reference to notice of alleged breaches, as well as other misconduct on the part of plaintiff in violation of the terms of the instrument.

All these matters were put in issue by replication, and will be more definitely stated in the opinion when necessary, in connection with the evidence relied on by the respective parties.

The by-laws of the plaintiff corporation, which were in evidence, referred to the duties of its president as follows:

"Section 2, Article 3. *President: Duties.*—The duties of the president shall be such duties as appertain to the executive head of a company of this kind. He shall preside at all meetings of the board of directors and at the stockholders' meetings, and shall, in addition to the powers herein enumerated, have such powers as may be conferred upon him under the general laws of the State of Misssouri. He shall be a member *ex officio* of the executive committee of the board of directors, shall appoint all committees of the board of directors, shall countersign all checks, and shall otherwise perform and discharge the duties of his office to the same degree and in the same manner as usually devolves upon officers of this kind."

It was further provided as follows:

"Section 1, Article 9. There shall be a loan and investment committee of the board of directors, consisting of three members of said board, whose duties shall be to invest the funds of the company, and to pass on all

loans and investments, and to supervise generally the handling of the funds of this company, and until it shall be further provided by the board, the executive committee of the company shall constitute such loan and investment committee, and shall perform all the duties in relation thereto.''

The by-laws also provided that the secretary shall sign all checks.

The evidence will be stated and examined in connection with the several points to which it refers. The instructions will be similarly treated.

The verdict of the jury was for the plaintiff for the full amount of the bond sued on, with accrued interest, and $400 as attorneys' fees. Upon the claim made in the petition for statutory damages for vexatious delay the verdict was for defendant.

I. The petition declares upon an obligation, signed also by one Theodor C. Peltzer, whereby the defendant agreed to pay plaintiff, as employer, ''such pecuniary loss, not exceeding ten thousand dollars as the employer shall sustain, of money or other personal property, by reason of any act or acts of larceny or embezzlement on the part of Theodor C. Peltzer, hereinafter called the employee, while acting as president, in the employ of said employer, and during the period commencing July 1, 1915, and ending with the termination of this bond,'' and avers that during said period plaintiff ''sustained pecuniary loss of money, and other personal property by reason of acts of larceny and embezzlement committed and done by the said Theodor C. Peltzer, . . . which said acts of larceny and embezzlement consist of the following, to-wit:'' Here follows the specification of seven instances in which it is alleged that Peltzer abstracted certain sums of money from the funds of plaintiff, amounting in the aggregate to about $20,000. Three of these, amounting to about $15,000, were submitted to the jury at the trial, re-

General Allegations.

sulting in a verdict of $10,000, the full amount of the obligation sued on.

The defendant objects to the sufficiency of the petition on the general ground that the facts upon which the claim of larceny and embezzlement is predicated are not sufficiently set forth in the petition. We do not see the force of this view. The petition consists of a single count, and states that after the execution of said obligation and, while it was in full force and effect, the plaintiff sustained pecuniary loss of money and other personal property by reason of acts of larceny and embezzlement committed and done by Peltzer to an amount exceeding $10,0000. Whether the objection to which we refer be intended to suggest that each act of alleged larceny or embezzlement should have been stated in a separate count, or that the substantive facts necessary to sustain a general charge of larceny or embezzlement should have been stated in each case, is immaterial after verdict. The failure to demur would constitute a statutory waiver of the first of these possible objections (R. S. 1909, sec. 1804), while the statement of the ultimate fact that the alleged loss resulted from acts of larceny and embezzlement would amount to a good cause of action, even if defectively stated. [Young v. Iron Co., 103 Mo. 324; Snyder v. Wagner Co., 223 S. W. 911.] In making these observations we do not intimate that the petition would have been vulnerable to attack by demurrer or motion interposed in the proper course of pleading.

II. Of the three items of alleged larceny or embezzlement submitted to the jury, the one described in the record as the Rapschutz transaction stands at the head of the corner, because the two remaining items do not equal the amount of the judgment, while its disposition requires the consideration of general questions applicable alike to all. We will, therefore, consider it separately in the light of its bearing upon all the issues presented in the case.

**Employee: Act of President.**

The first of these questions relates to the capacity of Mr. Peltzer as a party to the transaction in issue. In this respect the defendant contends that the contract of indemnity sued on is limited by its terms to acts done by Peltzer as an employee of the plaintiff corporation in the capacity of president, while the acts resulting in this loss bore no legal relation to the duties of that office or employment, but were transactions between the plaintiff in its corporate capacity on one side and Peltzer, acting for himself and as an individual, on the other side. In other words, that there was nothing in the transaction involving the relation of employer and employee, but that they acted at arm's length; Peltzer being in law unhampered by any duty or obligation as president of his adversary, and the latter having no legal right to expect him to be influenced by any duty arising out of his relation as its official servant. This interesting and ingenious position necessarily leads us to a statement of the facts relating to his duties as president on August 13, 1915, the date upon which it is alleged that, by an act of larceny, he abstracted from the funds in the possession of and belonging to the plaintiff, the sum of $7,016.33.

The plaintiff was duly organized and incorporated as a trust company under the provisions of Article Three, Chapter Twelve, Revised Statutes 1909. Its board of directors consisted of seven members, including Peltzer, Blackmore Louis and Albert L. Reeves. Peltzer was president, Louis secretary and Reeves general counsel of the company. These three constituted an ''executive committee'' with the broadest powers to control, direct and transact all business of the company, subject only to the approval of the board of directors at its meetings. Peltzer's membership was *ex officio*; that is to say, incidental to his office of president. This committee was also the committee on loans and investments, charged with the duty of examining and passing upon all investments of the company. He was charged generally with

all the duties usually appertaining to the executive head of a company of that kind. He appointed all the committees, and was required to countersign all checks signed by the secretary. He was employed in the capacity of president to perform all these duties, and his designation in the obligation in suit as "president" and "employee" included all these functions. If in the performance or non-performance of any of these duties he committed any act of larceny or embezzlement which resulted in pecuniary loss to the plaintiff, the indemnity clearly provided by the terms of the contract covered and included it.

In the consideration of this question we must bear in mind the fact that this contract indemnifies and is upon its face clearly intended to indemnify the Trust Company against the malfeasance of its principal officer who represented it and stood in its place in all things relating to the lawful performance of all acts included in his comprehensive duties as its head. In all such matters he was the visible body of the corporation. The indemnified was the corporation itself; an invisible body made up of stockholders and other beneficiaries of its resources. The indemnity is for their protection against the peculations of one in whose hands these resources are placed. It lived, as an entity, only in contemplation of law. The possession of its funds by its statutory treasurer was the possession of the corporation, and in this case their withdrawal by check required the signatures of both president and secretary. Should these officers knowingly unite in the wrongful withdrawal of any part of the funds of the corporation from its treasurer and its appropriation to their own use or to the use of any one of them, it is evident that such withdrawal and appropriation would be their own act and not the act of the corporation, and their knowledge of their own unlawful act and intention could not be attributed to it to shield them from any legal consequence of their wrong.

In the light of these simple principles we will examine the Rapschutz transaction, which occurred during the first six months of plaintiff's corporate existence. Mr. Peltzer was a prominent business man in Kansas City, apparently doing an extensive real estate and loan business. The evidence tends to show that one of his objects in promoting the organization of the Trust Company was its prospective convenience in connection with the rediscount of his real estate loans, and he immediately availed himself of its first accumulations for that purpose, and had, at the time of this transaction, already tentatively placed a number of such items with it, none of which had been submitted to the scrutiny of its board of directors. Being president of the new company, it was necessary, under the provisions of its by-laws, that he countersign all checks received by him on account of such rediscounts.

On April 13, 1915, he presented to Mr. Louis, the secretary of the company, whose duty it was, under the by-laws, to sign all checks against its funds, a mortgage apparently executed by one Gizella Rapschutz, a single woman, dated July 29, 1915, purporting to convey to a trustee three lots in Kansas City to secure the payment of her promissory note to Peltzer of the same date for $7,000, due five years from date, with interest payable semi-annually at the rate of six per cent per annum, evidenced by interest notes thereto attached. The deed of trust purported to have written thereon a certificate under the hand and seal of the Recorder of Deeds of Jackson County that it had been duly recorded in his office. The notes described accompanied the deed.

Thereupon a check was made out, signed by Louis as secretary and countersigned by Peltzer as president of the Farmers Loan and Trust Company, directed to the Commerce Trust Company, for $7,016.33 the amount of the principal note with accrued interest, which was duly presented and the amount thereof received by Peltzer and charged against plaintiff's funds in that

depository. The notes were at the time indorsed by Peltzer in blank "without recourse" and delivered to Louis. This was all done without the consent of the board of directors as provided and required by the terms of Section 1131, Revised Statutes 1909, nor is it shown that this rediscount passed under the observation of the executive committee, or that any abstract of the Rapschutz title was made or presented with the papers. The entire transaction was, at the time of the making of the check and receipt of the money thereon by Peltzer, solely between himself and Louis, without the intervention of any other party except the Commerce Trust Company, which paid it from plaintiff's funds without any knowledge, so far as the record shows, of the nature of the transaction out of which it grew. Plaintiff's name appears nowhere in the transaction except as maker of the check. It was formally admitted in the record by both parties that this mortgage and the notes which it purported to secure were forgeries; that the certificate thereon of the Recorder of Deeds, including his seal, was a forgery; and that these were forged by Peltzer, or by some other person by his procurement.

Summarizing the admitted facts: Peltzer was president of the plaintiff company, and in that capacity his fidelity is insured by the instrument in suit. One of his official duties was to countersign all checks upon the funds of the company, so that without his official signature no part of such funds could be withdrawn; in that capacity he signed the check in question and was enabled thereby and did take from the funds of the company $7,016.33, which he appropriated to his own use. For the purpose of procuring the signature of Louis, which was also necessary to enable him to abstract the money then in possession of the Commerce Trust Company, he forged Miss Rapschutz' notes and mortgage, asserting, by their presentation to Louis, that they were genuine obligations to himself.

That the entire series of criminal acts by which Peltzer took this money from his employer, the plaintiff, were done in violation of his duty to his employer as president, there can be no shadow of doubt. It may be that he forged these papers before the Trust Company was organized. If so, and he promoted it as a part of this scheme, his office was tainted with the criminal intent exhibited by the forgery from the moment he obtained it. If he conceived and made these papers while in office it was only a part of the crime which was consummated by taking the money with their assistance under cover of his official position and duties. There is no way in which the office can be separated from the crime without destroying the possibility that the crime should have been committed. They are inseparable.

III. The question is whether, under these circumstances, Peltzer stole this money, which he did if these facts come within the statutory definition of grand **Larceny.** larceny. For the purpose of bringing all the elements of the act within the express admissions of defendant we will not notice further the statement of Mr. Louis in his testimony that in signing this check he acted solely under the direction of Mr. Peltzer, the executive head of the company, letting the law speak for itself on that subject so far as is necessary. Before proceeding, we will again call attention to the fact that the wrong charged against Mr. Peltzer is a wrong against the plaintiff company, and not against Mr. Louis or any of its officers in their official capacity.

Larceny is defined as "feloniously stealing, taking and carrying away any money, goods, rights in action, or other personal property or vaulable thing whatsoever . . . belonging to another." [Sec. 4535, R. S. 1909.] This is a time-honored definition and has been before the courts in many aspects.

The defendant says (1) that the act of taking and appropriating this money as shown in the record does not "constitute larceny," because it comes within the definition of the offense of obtaining money by false token or pretense as described in Section 4565 of the same revision; and (2) if this theory be not tenable, it comes within the description of forgery in the fourth degree as described in Section 4655 relating to the sale of certain forged instruments; the transaction being a sale of the forged notes with their security by the defendant to the plaintiff, and therefore not larceny within the meaning of the undertaking sued on. These questions cover the entire controversy.

The act complained of is the felonious taking and carrying away of the money in question. That there must, to constitute larceny, have been an actual *taking* is not denied; neither is it denied that there was such a taking of the money of the plaintiff from the Commerce Trust Company by Mr. Peltzer through the agency of the New England National Bank of Kansas City, and that Peltzer actually received it and converted it to his own use. The question is, therefore, whether this taking was, in contemplation of law, against the will of the plaintiff; for if the plaintiff gave its consent with the purpose that it should thereby become the property of Peltzer, absolutely and unconditionally, then no larceny could be predicated of the act. The question between these parties is whether the act or series of acts by which Peltzer feloniously obtained and appropriated this money was an act of larceny within the meaning of our laws; that it was a felony under some one or more of the statutes we have cited cannot be denied, but whether it was larceny instead of obtaining money under false pretenses or forgery is the real question in issue.

Although the rule is that there must, to constitute larceny, be a taking against the will of the owner, still an actual trespass is not necessary. If a person, with

285 Mo.—41

a preconceived design to appropriate property to his own use, obtain possession of it by means of fraud or trickery, the taking amounts to larceny, because the fraud vitiates the transaction and the possession of the wrongdoer is still presumed to be the possession of the owner (Frazier v. State, 85 Ala. 17; Grunson v. State, 89 Ind. 533; Commonwealth v. Lannan, 153 Mass. 287; Defrese v. State, 3 Heisk, 53), or, as is sometimes said, the fraud or trick is equivalent to a trespass (Commonwealth v. Flynn, 167 Mass. 460; People v. Shaw, 57 Mich. 403). In this State it has been settled that where both the possession and title to property has been obtained from the true owner by fraud and falsehood there is no larceny, because the crime is characterized by the terms of Section 4565, supra, as obtaining it by false pretenses (State v. Anderson, 186 Mo. 25); but that the crime is larceny where *possession* of the property is obtained by fraud and trickery with intent to convert it to the use of the wrongdoer, which is afterward accomplished. [State v. Mintz, 189 Mo. 268.] It is by this rule that the present transaction must be judged.

One other rule may be stated at the outset. The acts of all instrumentalites employed by Peltzer in the accomplishment of his purpose are to be considered as the the acts of Peltzer, without reference to their innocence of any wrong intent in doing his bidding. [Commonwealth v. White, 123 Mass. 430, 1. c. 433; People v. Mills, 178 N. Y. 274; State v.| Mintz, supra, 1. c. 293.]

The first question is whether Peltzer, by trick or fraud, obtained *possession* of this money with the felonious intent to convert it to his own use. This, as we have said, is admitted. The trick by which he accomplished this purpose was itself a forgery upon which no title to the money could be founded. The statute which created the plaintiff (Sec. 1131, R. S. 1909) vested the power to loan its funds exclusively in its board of directors, and required them to keep a written record of its ap-

proval or disapproval of every loan, and further provided that "no bill shall be rediscounted by the trust company except with the consent of the board of directors." It is not necessary to determine whether this last provision refers to the rediscount by the corporation of paper offered for investment or not, because, under the previous provisions to which we have referred, it is plain that every loan negotiated by the executive officers of the company was subject to and only became effective upon the approval of the board recorded as required by its charter. Until this was done no money could lawfully be advanced on the security affirmed in the application. If actually advanced, it necessarily remained the property of the corporation until the board should act.

Notwithstanding these reasonable provisions of the law, the president and secretary of this company became a law unto themselves, usurping the power of the board of directors, and assuming the rights of private ownership of the funds of the corporation. The evidence discloses and the parties admit, in effect, that from the beginning Peltzer used his official status as president as a cloak and facility for criminal raids upon the funds of the company. Louis, the secretary, evidently unsuspicious of the criminal designs of his chief, looked to him for direction instead of looking to the law under which he held his position. When the forged securities were presented for discount no inquiry was made as to their character or genuineness. No abstract was required which would necessarily have shown the character of the spurious paper, and he joined with his chief in the execution of checks upon the funds of his company for advancement upon it. Peltzer brought the spurious securities to Louis, who, without question, signed a check for the amount they represented, which Peltzer countersigned, and upon which the funds were withdrawn by Peltzer from the bank the next day. The transaction then stood as if, at the time Peltzer brought the paper,

Louis had taken from the safe of his company $7,016.33 of its funds in legal tender notes and handed them to Peltzer, who then and there appropriated them to his own use.  He had induced Louis to join with him in abstracting it from the funds of the plaintiff with the intent to appropriate it to his own use, which he immediately did.  The transaction was then complete and stands now precisely as it stood at that moment.  There is no suggestion that Louis and Peltzer or either of them had any power under the charter to do this, even had the mortgage been genuine.  The act of each was unlawful, and a part of Peltzer's criminal scheme.

It is only necessary to determine the name of the crime which Peltzer had committed, for the case stands entirely upon its coincidence with the name used in the undertaking in suit.  As we have already said the answer to this does not depend upon any official relation between Louis and Peltzer, because Louis only figured in the transaction as Peltzer's innocent tool.  He represented Peltzer, and his act in signing the check had no other effect than if he had been the hand of Peltzer.  The corporation had neither purchased nor attempted to purchase the forged instrument and Louis had no authority to sign the check upon which the funds were withdrawn.  His ignorance and the purity of his intention protect him from sharing the criminal liability for the act, but confer no authority to purchase and pay for the forged paper without the approval of the board of directors.  Under these circumstances the money was wrongfully taken from the possession of plaintiff with felonious intent, and its taking and conversion constituted the crime of larceny within the meaning of our statute. Louis, as we have shown, having had no authority to purchase and pay for securities of the character simulated by these forgeries, his innocent joinder in the abstraction of the money by signing the check did not operate as consent, on the part of plaintiff, that it should became the property of Peltzer, and for that reason

Section 4565 of the Revised Statutes relating to false pretenses has no application. It only applies, as we have already shown, in cases where the title as well as the possession had passed to the wrongdoer by consent of the owner obtained through such unlawful means. It has no application to cases in which the possession is so obtained from one having neither the title nor the power to dispose of it. Had the money belonged to Louis, and were he the obligee in this bond, all these questions would stand in a different light.

We are of the opinion that the taking of this money with the concurrence and consent of Louis was without the consent and against the will of plaintiff; that the felonious intention of Peltzer at the time of the taking, as exhibited by the admitted facts, sufficiently characterize the act as grand larceny; and that Louis, instead of representing the plaintiff was simply the unsuspecting instrument used by Peltzer in the accomplishment of his purpose, by giving the necessary effect to the check. His signature had no more effect as indicating the assent of plaintiff to the withdrawal of the money than did the signature of Peltzer on the same paper.

The crime of Peltzer was the taking of the money. The instrument was a check, signed by himself and Louis. The inducement by which he obtained the signature of Louis was the forged security, which neither of them had any power to purchase for plaintiff. The forged instrument had performed its part and left the stage when Louis wrote his name. When Peltzer received the money in his hand every element of crime excepting plain larceny had been eliminated.

IV. The item designated in the petition and evidence as the O'Connell mortgage, amounting to $4,500, occurred substantially as follows: One James T. Robinson was an associate of Mr. Peltzer in some venture outside Kansas City. On August 7, 1915, Mr.

False Representation: Valid Check. Peltzer told Mr. Louis that he had arranged a loan to Mr. Robinson of that amount which was an exceptionally good one, which re-

quired an immediate advance of $2,500, and that he would bring in the papers in a day or two and receive the remainder of the amount. Mr. Louis immediately made plaintiff's check to Robinson for the amount of the advancement asked and delivered it to Peltzer, who countersigned it. On the same day he indorsed it by writing Robinson's name on the back, presented it to the Commerce Trust Company upon which it was drawn, and received the $2,500 for which it callel. On the 10th day of the same month Mr. Peltzer received a check for the remaining $2,000 of this promised investment, payable to Robinson, signed by Louis and countersigned by himself, which was also duly presented and paid to Peltzer upon the forged indorsement of Robinson. Within a day or two afterward he handed Louis a note to himself purporting to be signed by one Matt O'Connell, with a mortgage purporting to be executed by O'Connell and duly recorded, securing the same. These are admitted to have been forgeries.

Without going into the particulars of this transaction as admitted in the record, we will say that it differs in no material respect from the Rapschutz transaction otherwise than by the intervention of the name of Robinson, and that when the money was received by Peltzer he had not developed his felonious intent by the final act of forgery by which he expected and intended to conceal the crime. As in the Rapschutz matter, so in this, the crime consisted of the trick by which he obtained the money of plaintiff from the bank in which it was deposited. While in the Rapschutz matter he procured the assistance of Louis by presenting to him the pretended notes and mortgage, no such false pretense was made in this case. The help of Louis was obtained by a simple promise to make it right at sometime in the near future. This promise he kept, not for the purpose of obtaining the money, but to protect himself from discovery. The larceny was complete when the checks were paid.

It is admitted that the two checks aggregating forty-five hundred dollars, and signed by both Peltzer and

Louis, each in his official capacity, were the instruments with which Peltzer abstracted this money from the plaintiff's depository, and appropriated it to his own use. These checks, while made payable to Robinson, remained in the hands of Peltzer, the official agent of plaintiff charged with the duty of attaching the last signature before delivery. The blank indorsement of Robinson was needed to make it payable to bearer before it could accomplish its felonious purpose, and this was written upon it by Peltzer who, as the admission goes, presented it, received the money, and converted it to his own use. Appellant contends that taking the money on the check so indorsed constituted the crime of forgery under the provisions of Section 4644, Revised Statutes 1909, and does not, therefore constitute any breach of the indemnity against larceny or embezzlement provided by this undertaking. The question is interesting and requires careful consideration; the more so because the cases to which our attention is directed in the briefs give us little light in connection with these facts.

We have already referred to the fact that the purchase of paper of the character contemplated in the Robinson transaction without the recorded approval of the board of directors is expressly forbidden by the terms of plaintiff's charter. It follows that the advancement of $4500 to one Robinson in contemplation of such a loan would be a violation of duty on the part of each and both the officers who signed this check. Robinson was, so far as this transaction goes, a fictitious party to the check. Although nominally the payee, he was a stranger to it, and the admissions of the parties upon the trial disclose that he was a dummy whose name, and not his personality, was used for the sole purpose of enabling Peltzer to get into his hands a valid check of plaintiff which he might use in a contemplated raid upon its funds. He was, accordingly, dropped from the transaction. The check was vitalized solely by the signature of these officers, one of whom, as we have already said, was using the other as the instrument of his felonious design.

When the secretary received the bogus securities Robinson had no connection whatever with the matter, and the forged note and mortgage appeared to have been executed by O'Connell to Peltzer himself.

Under these circumstances the writing by Peltzer of the name of James T. Robinson across the back of this check is but a minor incident in the composite act of abstracting this money from the depository of plaintiff. The controlling element was the valid check upon which the money was drawn, and this he manipulated as these circumstances required. The abstraction of the money was the crime. Had he personated Robinson in presenting and receiving the money on the check the resulting culpability would have been no different. In either case the manual act of taking the plaintiff's money would have been the controlling element and the check the controlling instrument. Robinson had no interest in the check, and the writing of his name on its back in no way affected it, nor did it impose any liability on him for the fund was there, and he had no interest in it.

We have read with interest Sections 4643 and 4644 on which defendant's contention is founded, but find it unnecessary, for the reasons we have stated, to express any opinion as to whether or not the writing of the name of James T. Robinson across its back constituted such an alteration as comes within their terms. We think the taking an appropriation of this money by Peltzer by the means and in the manner described in the record was larceny as defined by our statute.

V. The defendant pleads as a defense the condition of the bond "that immediately and in any event within ten days after discovery of any act of the employee

Notice.     which might cause a loss for which claim could be made under this bond, the employer shall have delivered notice thereof to the surety at its general office in St. Louis, Missouri," and alleges that such condition was not performed by plaintiff.

This is an affirmative defense, and calls for some evdence to establish it. About seven weeks after re-

ceiving the money in the Mat O'Connell case Mr. Peltzer fell from the fifth-story window of the office of his company in Kansas City and was killed. The circumstances are said in the evidence to have been sensational and to have received sensational notice in the newspapers. Immediately after this occurrence the plaintiff instituted an examination with reference to his dealings with it, and on the first day of October wrote defendant stating the date and manner of his death, that a careful investigation was in progress touching his business relation to plaintiff, with the result that apparent irregularities aggregating about $9,000 had been discovered which were covered by the bond sued on, and that claim would be made by plaintiff for that and such other irregularities as might come within the provisions of the bond to its face amount, and offering such other information as defendant might desire.

Plaintiff received a reply to this under date October 5th, stating that it would expect compliance with all the terms of the bond, and directing attention to the the following: "That within ninety days after discovery of such loss, the employer shall have delivered to the Surety, at its General Office in St, Louis, Missouri, written claim stating the items and the dates of the losses." One of its representatives also called on plaintiff's general counsel and asked permission to examine the books of plaintiff, which was granted, but not exercised until about three months afterwards. The investigation of plaintiff continued, the defendant being notified by letter constantly of its progress and the facts which it disclosed until October 11th, when all the items now in controversy had been discovered and communicated to defendant. It is unnecessary to repeat this correspondence, as the immediate notice required by the bond was supplemented by the provision that within ninety days after the discovery of the alleged loss the plaintiff should make a written claim stating the items and dates of the losses; that this was done is not disputed.

The immediate notice applied only to "any acts of the employee which might cause a loss for which claim could be made under this bond," that is to say, acts of larceny or embezzlement. Until the acts constituting these criminal elements were discovered no notice was due.

There is no evidence whatever in the record that in either the Rapschutz or O'Connell case the plaintiff had notice of any act of Peltzer giving rise to a claim upon the bond until after his death on September 29, 1915. As we have already said in a previous paragraph, the forgeries committed in those cases constituted the evidence which characterized his acts in obtaining the money as felonious. These were the evidence that in inducing Louis to sign the checks and in signing them himself he intended feloniously to appropriate the money he expected to receive on them to his own use, and that when he took the money into his own hands he completed the crime by giving effect to that intention. These forgeries conclusively establishing his guilt were not known to the plaintiff until after his death, when they constituted the thread by which the transactions were unraveled. The plaintiff, with the clue thus obtained, acted promptly and in full accord with the spirit of its undertaking. Up to that time, with a knowledge of all the facts accessible in its records, it might well believe that, while its executive officers had exceeded or mistaken their powers, their intentions were honest, and the stockholders fully protected by honest securities.

VI. The remaining act of larceny with which Peltzer is charged consists of the following facts: Mr. Louis took a business trip to Chicago, and, anticipating that money might be needed in the course of plaintiff's business during his absence, signed in the blank check book used for that purpose three of the blank checks which he left with Miss Cummins, his stenographer, for that purpose. While he was gone and on September 11, 1915, Mr. Peltzer called her by telephone and asked her if she had any checks signed.

Felonious Intent.

She answered, "Yes." He asked her to bring one and meet him at the Commerce Trust Company, which she did, taking two of the signed checks. He took them upstairs to the Southwest National Bank, and filled out one of them for $3,350, and sent her downstairs with it to the drawee, from which she got a cashier's check for it, He then gave her his passbook of the New England National Bank, where she deposited the cashier's check. When Mr. Louis returned from Chicago on Monday September 13, he saw the stub of this check, took it to Mr. Peltzer's office and asked an explanation. Mr. Peltzer said it had been drawn by him, that it was a life saver, and that he would get some good stuff and turn over for it or pay back the money. Mr. Louis told him he had better put the money back immediately, which Peltzer promised to do. Afterwards, on September 20th, he gave Louis a check for the amount, with $16.50 interest, on the New England National Bank of Kansas City. This check had not been paid at the time of Peltzer's death and still remained unpaid at the trial. The bank refused to pay it on the ground that there were no funds in Peltzer's account.

Mr. Louis, for plaintiff, had advanced the money to Peltzer for his own use, with the understanding that it was to be repaid out of the proceeds of a loan then contemplated. It was received by Peltzer with the same understanding. We do not think there was any element of larceny in this incident as detailed in the evidence, unless it arises out of the existence of the intention to steal in connection with the Rapschutz and O'Connell transactions. We do not think that the fact that a person has committed a crime is sufficient to convict him in another case. There was, in this instance, no evidence of larceny or deceit. Both Louis and Peltzer had the full power to act for plaintiff in the transaction of all business authorized by its charter, and no money could lawfully be withdrawn otherwise than by their joint act in signing its check. It had been the habit to draw upon

its funds in this manner for advancements to Peltzer which had been repaid. The obligation of the bond providing indemnity against larceny requires the felonious intent, which must be averred in every indictment for that offense.

The facts of this incident were immediately submitted to the general counsel of the plaintiff company. The evidence impresses us that this was done because the withdrawal had reduced the funds of the company to an amount less than that required by its charter, Whatever may have been in the minds of the secretary and general counsel, they evidently did not consider that, in this respect, its president had committed an act within the provision of the bond requiring notice to be immediately given to the surety, and we are of the same opinion.

VII. Instructions were given for the plaintiff against the objections of defendant on grounds mostly included in the general statement that they submitted the construction of the contract sued on, or permitted the jury to wander in their deliberations over fields outside the issues raised by the pleadings,
Erroneous in search for misconduct on the part of
Instructions: Mr. Peltzer. We are required to examine
Judgment these instructions only for the purpose
for Right Party. of ascertaining whether, in giving them
to the jury, the trial court committed error against the appellant materially affecting the merits of the action. [R. S. 1909, sec. 2032.] Otherwise we must let the judgment stand, even though the instructions did not correctly state or incorrectly stated the law. The infallible test is whether the judgment, upon the entire record, was clearly for the right party. [Aronovitz v. Arky, 219 S. W. 620; Petersen v. Transit Co., 199 Mo. 331; Mockowik v. Railroad, 196 Mo. 550; King v. King, 155 Mo. 406; Jones v. Railroad, 178 Mo. 528; Barkley v. Cemetery Assn., 153 Mo. 300; Chambers v. Railway, 111 Mo. App. 609; Railway v. Railway, 110 Mo. App. 300;

Crescent Planing Co. v. Spilker, 77 Mo. App. 409; Hannon v. Transit Co., 102 Mo. App. 216.] If, therefore, the verdict and judgment could not, under the pleadings and evidence, have lawfully been otherwise, it must stand, notwithstanding any infirmity which might be discovered by scrutiny of the instructions.

Although the gravamen of the case lies in the alleged commission of a felony by one not a party, it is a civil and not a criminal action and the rules relating to evidence in civil cases must be applied to ascertain, from its preponderance, whether Mr. Peltzer was guilty of grand larceny, the crime charged. [State v. Ellison, 268 Mo. 239; Rothschild v. Ins. Co., 62 Mo. 356; Edwards v. Knapp & Co., 97 Mo. 432; Smith v. Burrus, 106 Mo. 94.] In the course of the trial the defendant adopted, and rested its entire defense upon, the theory that the acts which Mr. Peltzer was found to have committed in what we have designated in the preceding paragraphs the Rapschutz and O'Connell transactions, constituted the felonious obtaining of money by false pretenses or forgery, and to make that defense so plain and obvious that the jury would not have to be called upon to consider it as a question of fact, its counsel joined with the counsel of plaintiff in making certain admissions. This course was commendable, and in arriving at the conclusions expressed in the preceding paragraphs we have considered no.fact not expressly or by necessary legal implication admitted by the defendant to be true. They exclude every hypothesis other than that the eleven thousand five hundred dollars included in the two items was taken by Peltzer from the plaintiff by acts of larceny, and the evidence does not tend to sustain the defense of want of notice as pleaded.

The competency of Louis as a witness on behalf of the plaintiff was challenged on the double ground that he was the official agent of plaintiff in the transactions

**Witness.** in issue and on trial, and that he was, at the time of the trial, interested in the result as a

stockholder of plaintiff. For the reasons we have already stated his testimony was unnecessary, and his competency or incompetency immaterial, and it is unnecessary to determine that question, however interesting and instructive its discussions might be.

The judgment of the Jackson Circuit Court is affirmed. *Ragland* and *Small, CC.,* concur.

PER CURIAM:—The foregoing opinion of BROWN, C., is adopted as the opinion of the court. All of the judges concur, except *Woodson, J.,* not sitting.