**Nick ANDRA, Plaintiff-Respondent,**

v.

**ST. LOUIS FIRE DOOR COMPANY, Inc., a Corporation, Defendant-Appellant.**

No. 44925.

Supreme Court of Missouri.

Division No. 1.

Feb. 13, 1956.

Motion for Rehearing or to Transfer to Court en Banc Denied March 12, 1956.

G. W. Marsalek, Moser, Marsalek, Carpenter, Cleary & Carter, St. Louis, for appellant.

Glennon T. Moran, St. Louis, for respondent. George J. Moran, Moran & Beatty, Granite City, Ill., of counsel.

HOLMAN, Commissioner.

Action for damages against defendant, St. Louis Fire Door Company, wherein plaintiff, Nick Andra, sought to recover for personal injuries sustained in an industrial accident. The jury returned a verdict for plaintiff in the sum of $14,000, but the trial court ordered a remittitur of $3,000 and upon compliance a judgment was entered for $11,000. Defendant has duly appealed.

Plaintiff had been employed as a laborer by Alport-Carlo Construction Company, the general contractor engaged in the construction of the U. S. Army Depot at Granite City, Illinois. Defendant had the contract to install about 500 fire doors in this depot. On the day of the accident, October 22, 1952, all but about six sections had been erected and defendant had three employees at work on these remaining doors. Apparently, for convenience in handling, each door is made in two sections. Each section weighs 600 pounds, is 14 feet high and 6 feet wide. When the sections are hung on the track and fitted together, a 4-inch iron band overlaps so they can be bolted together, thus making one door 12 feet wide.

Robert Lloyd, construction superintendent for defendant, testified that it was customary for subcontractors to borrow laborers from the general contractor; sometimes they charged for them and at other times they would not. On the day in question plaintiff and some other employees of Alport-Carlo were cleaning trash from the floor of the warehouse. Thomas H. Box, an employee of defendant, asked plaintiff's foreman for laborers to assist in "raising" the two sections of a door as hereafter de-

scribed. Plaintiff, "Big John" Connor, Joseph Cunningham and Harry Speiss were sent to so assist defendant's employees. They placed the first section in front of the opening and, with four men at the top of the door and one on each side, they raised it by "walking it up" past the vertical and left it leaning against the door jamb. The bottom was variously estimated to be from eight inches to two feet off vertical. Mr. Cunningham testified that he suggested they give it more "lean" but everyone ignored him. The same procedure was to be followed in raising the second section except there was a conflict in the testimony as to whether this section was placed in a position so that it would overlap the first section or was to be separated from it by about six inches.

When the second section had been raised about three fourths of the way up it slid or kicked forward striking the bottom of the section that was standing and thus caused that section to fall back upon the second section. The men tried to hold both sections but the combined weight was too much for them and when a "man hollered to let it go" they all tried to get out from under the doors. Plaintiff turned to run and the doors hit the back of his head, flipped him forward onto his face, and then fell upon his body from the waist down. In this manner he received certain injuries which it is unnecessary to detail herein.

There was testimony that there were two methods frequently used to keep these doors from slipping while being raised. One was to have a man stand at the bottom of the door and brace the bottom of the door with his foot, from the opposite side. While not entirely clear in one place, as we construe the testimony, there was no evidence that this method was used on the occasion in question. The other method was to place 2″ x 4″ wooden blocks or "softeners" under the bottom of the door. The heavy doors bite into the soft wood as they are raised and are less likely to slip on the concrete floor. There was considerable conflict in the testimony as to whether blocks were used on this occasion. Box, as plaintiff's witness, stated that he thought they were used but was not sure. Mr. Cunningham, also a witness for plaintiff, said he had no recollection of any blocks but couldn't definitely state that none were used. Plaintiff called Robert Lloyd, defendant's superintendent, who testified definitely that no blocks were used. Seifert, defendant's witness, said he couldn't remember whether or not blocks were used on this door but admitted having testified in his deposition, taken a year before trial, that none were used. Plaintiff testified that two-by-fours were used under the door.

The first contention of defendant is that the trial court erred in overruling its motions for a directed verdict as the evidence disclosed that plaintiff was a borrowed employee of defendant and hence his exclusive remedy would be under the Illinois Workmen's Compensation Law. Each party agrees that the issues in this case must be determined according to the substantive law of Illinois. The Illinois Workmen's Compensation Act contains a provision to the effect that certain employers engaged in enterprises therein declared to be extra hazardous, and all their employees, are automatically under the provisions of the Act. Chapter 48, Section 138.3, Smith-Hurd Ill.Ann.Statutes. For the purposes of this case we will assume, without deciding, that defendant, on the occasion in question, was engaged in such an enterprise and that therefore the defendant and its employees were subject to the provisions of that Act. We must therefore proceed to determine, under the facts of this case, whether plaintiff was at the time of the injury an employee of defendant. In their briefs each of the parties agree that there is no dispute concerning the applicable facts and that we should decide the question as a matter of law. Such seems to be in accord with recent Illinois decisions. American Stevedores Co. v. Industrial Commission, 408 Ill. 449, 97 N.E.2d 325.

■ "At common law an employee in the general employment of one person may, with his consent, be lent to another for the performance of special work and become the employee of the person to whom he is

lent while performing such special service. * * * This same principle of law applies to cases arising under the Workmen's Compensation Act." Allen-Garcia Co. v. Industrial Commission, 334 Ill. 390, 166 N.E. 78, 80. See also, Forest Preserve District of Cook County v. Industrial Commission, 357 Ill. 389, 192 N.E. 342, and American Stevedores Co. v. Industrial Commission, supra. The defendant strongly relies on the three cases last cited. In each of these cases the "lent-servant" doctrine was held applicable under facts which we think differed in important respects from those in the instant case.

■ In Ellegood v. Brashear Freight Lines, 236 Mo.App. 971, 162 S.W.2d 628, 633, the court, after an exhaustive review of the cases (including two of the aforementioned Illinois cases), properly stated the applicable test as follows: "From the foregoing cases we find the law to be that the relation of employer and employee exists as between a special employer to whom an employee is loaned and said employee whenever the following facts concur: (a) consent on the part of the employee to work for the special employer; (b) actual entry by the employee upon the work of and for the special master pursuant to an express or implied contract so to do; (c) power of the special employer to control the details of the work to be performed and to determine how the work shall be done and whether it shall stop or continue." It appears clear that a vital question we must consider is whether plaintiff made a contract for hire, express or implied, with the defendant. In this connection we think the following observations concerning the "lent-servant" doctrine in Larson, Workmen's Compensation Law, Vol. I, Section 48.10, at pages 711–12, are applicable: "In compensation law, the spotlight must now be turned upon the employee, for the first question of all is: did he make a contract of hire with the special employer? If this question cannot be answered 'yes', the investigation is closed, and there is no need to go on into tests of relative control and the like. This must necessarily be so, since the employee loses certain rights along with those he gains when he strikes up a new employment relation. Most important of all, he loses the right to sue the special employer at common law for negligence; and when the question has been presented in this form, the courts have been very vigilant in insisting upon a showing of a deliberate and informed consent by the employee before employment relation will be held a bar to common-law suit. * * * The only presumption is the continuance of the general employment which is taken for granted as the beginning-point of any lent-employee problem. To overcome this presumption, it is not unreasonable to insist upon a clear demonstration that a new temporary employer has been substituted for the old, which demonstration should include a showing that a contract was made between the special employer and the employee, proof that the work being done was essentially that of the special employer, and proof that the special employer assumed the right to control the details of the work."

■ It is, of course, conceded that there was no express contract between plaintiff and defendant. We will therefore consider whether it may be said that an implied contract existed under the facts before us. The most important and perhaps controlling facts were developed on the cross-examination of plaintiff as follows:

"Q. Mr. Andra, the day of this accident, were you working with Ernie Tyler as your foreman, just like Mr. Cunningham was? A. He was the day foreman on the job, Ernie Tyler was.

"Q. And was it Ernie Tyler who sent the four of you over to help with this door? A. Me and John Connor, we was working right close together, we was working as partners, you see, and I was working a little ways from John Connor and Ernie Tyler he come back and he was talking to John and I saw him pointing over to the door over there, and John come by me and told me to 'let's go over and help him on the door.'

"Q. Did you see Mr. Tyler pointing to the door? A. Yes.

"Q. When John said 'come over,' did you understand that is what Mr. Tyler had been talking about? A. Well, I just took it for granted that he was talking about the door.

"Q. Did you go over there willingly, I mean it was all right with you to help out on the job? A. Well, John, he was my partner, and we always worked together, and when he said, 'Let's go over there and help on the door,' I went along with him.

"Q. Did you ever help on the fire doors before around there? A. No, sir.

"Q. When you got over there, who told you what to do, Mr. Andra? A. Well, when we got over there, Harry Speiss and Joe Cunningham was there, and the two men from the Fire Door Company, and they were just gathered around the door and somebody says, 'Let's get it on up there,' and we commenced lifting the doors up.

"Q. Who was it said 'Let's get it on up there,' do you remember? A. Well, I guess it was the man from the Fire Door Company."

We have concluded that these and other applicable facts are not sufficient to authorize a finding that plaintiff was an employee of defendant. This results primarily from the failure of defendant to prove facts indicating an implied contract of employment. In the three cases heretofore cited, in which the "lent-servant" doctrine was applied, the employee had worked for the special employer for at least a week and at a place far removed from the premises of the general employer. These circumstances are in sharp contrast with those existing in the instant case. Plaintiff was helping raise these doors just a short distance from and in sight of the place of his regular employment. He had been working there from 15 to 30 minutes. Apparently, had the accident not occurred, the task would have been completed in a few seconds more. We are strongly convinced that the slight deviation from plaintiff's regular duties, in both time and situs, required in raising these door sections, is very persuasive in determining the issue relating to the ex-

istence of an implied contract of employment. It is easy to understand that when an employee is loaned to a special employer for a day or more, it is natural and reasonable that both he and the alleged special employer would give consideration to the employee-employer status which might well result in conduct or expressions indicating an implied contract of employment. In the instant case all of the circumstances indicate that plaintiff, his foreman and the agents and employees of defendant all understood that the Alport-Carlo workmen were merely giving temporary assistance more or less as an accommodation. There was no indication of any agreement between defendant and Alport and it even appeared doubtful that Alport would charge defendant for the time so spent by its employees. Under these circumstances it is difficult to conceive of any consent or understanding in the mind of plaintiff that he was becoming (even temporarily) an employee of defendant and nothing in his conduct or expressions would so indicate.

In this case plaintiff was actually assisting with the doors at the direction of the foreman for his general employer. Under the circumstances shown, we think it is clear that he considered that Alport continued as his employer and that he was still under the general control of Alport. If, at any time, the Alport foreman had directed that he return to his regular duties he would undoubtedly have done so immediately. This case is similar to that of Rhinelander Paper Co. v. Industrial Commission, 206 Wis. 215, 239 N.W. 412, wherein an employee of the paper company was injured while assisting an engineering company in installing new boilers on the premises of his general employer. In holding that no new employee-employer relationship was created the court stated, 239 N.W. 412, 413: "Where an employee enters the service of another at the command and pursuant to the direction of the master, no new relationship is created. While the employee may be subject to the direction of the temporary master, he is there in obedience to the command of his employer, and in doing what the new master directs him

to do, he is performing his duty to the employer who gave the order. * * * In this case the employment was temporary. It is clear that the claimant was performing services in obedience to the direction of the master and that there was no consent on his part, express or implied, sufficient to make him the employee of the American Engineering Company. Consent cannot be inferred merely from the fact that the employee obeyed the commands of his master in entering the services of another." See also, Northern Trust Co. v. Industrial Commission, 231 Wis. 133, 285 N.W. 339; Quick v. Allegheny Const. Equipment Co., 361 Pa. 377, 65 A.2d 238, and Evans v. Farmers Mut. Hail Ins. Co., 240 Mo.App. 748, 217 S.W.2d 705.

, What we have heretofore said will also dispose of the alternative contention of defendant that the court should have at least submitted the issue of plaintiff's employee status to the jury as hypothesized in its proffered Instruction A which was refused.

 Defendant next complains of error in the giving of plaintiff's Instruction No. 1 (his sole verdict-directing instruction) which submitted defendant's negligence in the following manner: "Therefore, if you find and believe from the evidence that the defendant failed to use means to secure the bottom end of the said fire door so as to prevent it from slipping, and if you further find that in so failing to secure the bottom of said door defendant failed to exercise ordinary care and was negligent, * * *." It is contended that this submission was erroneous in a number of respects, among them being that it constituted a roving commission to the jury to decide what defendant should have done to prevent the door from slipping without guidance as to the means defendant should have used and failed to use to secure the bottom of the door, and further, that it permitted the jury to find for plaintiff on a theory that was contrary to plaintiff's own testimony. We have concluded that an apparent vice in this instruction is that it required the jury, in order to find for plaintiff, to disregard plaintiff's own personal testimony and make a finding contrary thereto.

The instruction required a finding that defendant failed to use means to secure the bottom of said door so as to prevent it from slipping. We think the only reasonable construction that can be placed upon the phrase "failed to use means" is that it meant "failed to use *any* means." It will be recalled that there was evidence of only two methods customarily used to prevent these doors from slipping, i. e., (1) the placing of two-by-four blocks under the bottom of the door and (2) to have a man stand at the bottom of the door and brace it with his foot from the opposite side. It is true that there was substantial evidence that defendant failed to use two-by-fours or any other means to prevent slipping on this occasion, but the difficulty is that the personal testimony of plaintiff was that one means, i. e., two-by-fours, was used. He is bound by this evidence and is not entitled to go to the jury on a theory which impeaches his own testimony. Fisher v. Gunn, Mo.Sup., 270 S.W.2d 869; De Lorme v. St. Louis Public Service Co., Mo.App., 61 S. W.2d 247; Murray v. St. Louis Transit Co., 176 Mo. 183, 75 S.W. 611. It is undisputed that the use of two-by-four "softeners" is a *means* of preventing such doors from slipping. Since the instruction required a finding that defendant "failed to use means" and plaintiff testified that a "means" was used, it becomes clear that plaintiff's testimony prevented his recovery under the submission he chose to hypothesize in the instruction under consideration.

A review of this record indicates, however, that plaintiff may be able, in the event of retrial, to draft an instruction, supported by the evidence, properly submitting a theory of recovery.

Defendant also contends that under the substantive law of Illinois plaintiff was required to allege, prove and submit the exercise of due care on his part as an essential element of his claim. While there was ample evidence to establish that fact, it was not alleged in the petition or submitted as an element of plaintiff's case. In this connection, it should be noted that at the time this case was tried such was not required by the decisions of this court. At

that time it was the rule that the matter of plaintiff's contributory negligence was governed by the Missouri rule and had to be pleaded by defendant as an affirmative defense, even though the action arose in Illinois. Menard v. Goltra, 328 Mo. 368, 40 S.W.2d 1053.

The trial of the instant case was concluded on December 10, 1954. On December 13, 1954, this court filed an opinion overruling the Goltra and similar cases and holding that the Illinois requirement that a plaintiff prove and submit that he was in the exercise of due care is substantive rather than procedural, and hence required in cases tried in Missouri where the cause of action arose in Illinois. Redick v. M. B. Thomas Auto Sales, 364 Mo. 1174, 273 S.W. 2d 228. While this case did not hold that a plaintiff should also make this allegation in his petition, it would seem that such would logically follow from the reasoning therein since the Illinois cases so hold. Hanson v. Trust Co. of Chicago, 380 Ill. 194, 43 N.E.2d 931.

It is noteworthy that there was no issue as to contributory negligence in the trial court. Defendant did not plead such although required to do so at that time under the decisions. Moreover, no apparent effort was made by defendant to prove any contributory negligence on the part of plaintiff.

In the situation we have described, we see nothing to be gained by further developing or actually determining the assignment before us. Since, as already indicated, the case must be reversed on another ground, any essential omission in plaintiff's charge, proof or submission may be supplied on another trial.

The judgment is reversed and the cause remanded for a new trial.

VAN OSDOL and COIL, CC., concur.

PER CURIAM.

The foregoing opinion by HOLMAN, C., is adopted as the opinion of the court.

All concur.