**BLUE RIDGE BANK, Appellant,**

v.

**STATE BANKING BOARD, Respondent,
Southeast State Bank, Intervenor.**

No. KCD 26346.

Missouri Court of Appeals,
Kansas City District.

May 6, 1974.

Ilus W. Davis, James E. Cooling, Dietrich, Davis, Burrell, Dicus & Rowlands, Kansas City, for appellant.

Norman O. Sanders, Robert E. Gould, Sheridan, Sanders, Carr, White & Mason, Kansas City, for respondent.

Before DIXON, C. J., and SHANGLER and WASSERSTROM, JJ.

SHANGLER, Judge.

The intervenor Southeast State Bank made application under § 362.325, RSMo 1969, V.A.M.S., to the Commissioner of Finance for relocation of its main banking house from 31st and Prospect to U.S. Highway 40 near the Harry Truman Sports Complex in Kansas City, Missouri. The Commissioner after due investigation issued a Certificate of Authority for relocation of the bank. The Blue Ridge Bank, Noland Road Bank, First National Bank of Independence and the Kansas City Chapter of the NAACP appealed the ruling of the Commissioner to the State Banking Board. NAACP did not proceed further. The Board conducted the hearing required by § 361.094, RSMo 1969, V.A.M. S.—at which extensive testimony, graphs, charts, maps, expert studies and statistical data were received—entered findings of fact and conclusions of law and affirmed the decision of the Commissioner. The Blue Ridge Bank, only, sought review in the circuit court of the determination of the Board, and alone appeals the judgment of the circuit court which has affirmed the decision of the Board. The Southeast State Bank, not designated as a party to the appeal, intervened by leave of the circuit court and is here as a respondent.

The respondent Southeast State Bank was established at 3131 Prospect in Kansas City, Missouri, in 1918 and by the end of 1971 had developed capital surplus and undivided profits accounts amounting to approximately $2,500,000. There was evidence that the area in which Southeast is located is among the most densely populated in the city. It is an area, however, in steady decline. The high incidence of crime has been accompanied by marked deterioration of retail business, construction activity, population, income and homes. Thus, although there are 148,000 people in this area, only 50% of Southeast's deposits are derived from the surrounding community. Analysis of the depositors shows that a large proportion of them have abandoned this neighborhood for areas of more growth and stability. Although Southeast has consistently shown a profit in the past, its rate of growth has been substantially less than that of most other banks in the metropolitan area.

The area to which Southeast seeks to relocate is 4.2 miles east of its present site. The proposed location is 2.3 miles from appellant's bank situated at the Blue Ridge Mall Shopping Center. Immediately south of the proposed site is the Harry Truman Sports Complex, while to the north and west is an extensive underground mining area. The general characteristic of the population of that suburban area was described as of medium and medium-high income, and the housing predominantly single-dwellings. There was evidence of recent construction of apartment complexes

and expert prediction of significant development of multi-family units in the future.

The voluminous record contains extensive evidence of the parties, much of it countervailing, concerning the demographic characteristics of the proposed relocation area. This evidence, largely statistical, is not susceptible of easy comparison because the experts for the respective parties, in making their studies and conclusions, defined the service area for the proposed location differently. Southeast's expert worked from an arbitrarily chosen, irregularly shaped area determined, roughly, by major geographical features and existing transportation networks, while appellant Blue Ridge Bank, just as arbitrarily, adopted the area encompassed within a circle of 4000 yards radius.[1] Southeast presented evidence of existing and projected population growth and economic expansion and development in the area. On the basis of this data and American Banking Association standards, their expert predicted a potential of $55,000,000 in time deposits, $13,500,000 in savings deposits, and $8,700,000 in demand deposits from residents of the relocation area which, if only modestly penetrated by Southeast, would ensure a successful operation. The experts concluded that this could be accomplished without taking present business from existing banks, and that the solvency of Blue Ridge Bank would not be endangered by the proposed relocation.

The appellant Blue Ridge Bank questioned the underlying reliability of these projections and presented evidence to show that much of this deposit potential was already adequately served by appellant and other banks. The president of appellant Bank testified that five to six million dollars in deposits would find a bank in the area where Southeast sought to relocate more convenient and would be captured by the relocating bank. It was his judgment that the proposed relocation of Southeast would result in the reduced profitability, and eventual insolvency, of the Blue Ridge Bank's operation. There was other expert testimony by appellant that Southeast would probably lose 50% of its present $16,206,000 in deposits by the proposed relocation, and such a depletion coupled with an increase in expenses would result in eventual insolvency. Another expert for the appellant testified, however, that although Blue Ridge Bank would suffer an erosion of profits as a result of the relocation, insolvency would not result.

The relevant Statute [§ 362.325(7)] requires that if an existing bank wishes to change its location, the Commissioner of Finance shall examine

Whether the convenience and needs of the new community wherein the bank desires to [re]locate are such as to justify and warrant the opening of the bank therein and whether the probable volume of business at the new location is sufficient to insure and maintain the solvency of the bank and the solvency of the then existing banks and trust companies at the location, without endangering the safety of any bank or trust company in the locality as a place of deposit of public and private moneys. . .

The Commissioner of Finance determined that these statutory requirements had been met and issued the relocation authority. On appeal, the State Banking Board found that the convenience and needs of the community at the proposed site warranted the relocation and that the move would not endanger the safety or solvency of either the Southeast State Bank or of the other banks in the locality, and affirmed the authority for relocation granted by the Commissioner of Finance. The appellant Blue Ridge Bank asserts that these findings are clearly contrary to the overwhelming

---

1. This is the distance within which a then existing bank was permitted to establish a separate banking facility. § 362.107. [This section was repealed by Laws 1972, p. 973, to eliminate any requirement that the adjunct bank be in a designated proximity to the parent bank.]

weight of the evidence and that the determination of the Board should be set aside. Appellant contends also that the Board erred in admitting certain evidence and that the removal of Southeast from an area where there was an admitted need for banking services was an abuse of discretion and in violation of constitutional standards.

We notice first the point in appellant's brief that: "The decision of the State Banking Board is in violation of the Due Process and Equal Protection Clauses of the Missouri and United States Constitution." This point does not explicate how or in what manner the decision of the Board is in violation of constitutional principle or what right of appellant has been infringed, and therefore presents nothing for review. Hilke v. Firemen's Retirement System of St. Louis, 441 S.W.2d 730, 733 [3, 4] (Mo.App.1969). This contention is briefly elaborated to assert that the relocation would deny banking services to citizens presently served by Southeast State Bank and therefore "deprive(s) [such citizens] rights granted to [them] by the Missouri and U.S. Constitutions". The sum of the matter is, however, that appellant Bank has no standing to assert governmental action unconstitutional because it hurts a neighbor, rather, "a litigant himself must be hurt by the unconstitutional exercise of power before he may vex the judicial ear with complaints". State ex rel. Crandall v. McIntosh, 205 Mo. 589, 103 S.W. 1078, 1082 [1] (banc 1907); State ex rel. Toliver v. Board of Education of City of St. Louis, 360 Mo. 671, 230 S.W.2d 724, 730 [8] (1950).

We consider next the contention that inflammatory, prejudicial and hearsay evidence was received by the Board over the objection of appellant. This complaint is differentiated into two particulars: (1) the admission of a survey and map of crime in the Kansas City area generally and of the site of Southeast State Bank's present location particularly and (2) the admission into evidence of the file of the Commissioner of Finance.

The map and survey were hearsay and should not have been received. This evidence was presented by the president of respondent Southeast State Bank from an issue of the Kansas City Star. The witness had not prepared the exhibit, could not say who had, and was otherwise unable to establish its authenticity. For reasons which we expound fully later, the crime rate of the present location of respondent Bank was simply not a material factor to be considered in allowing relocation under § 362.325 and therefore any error in the admission of the exhibit was harmless. Farmers Loan & Trust Co. v. Southern Surety Co., 285 Mo. 621, 226 S. W. 926, 936 [13] (1920). Rulings on evidence immaterial to the issues or not affecting the merits are not ground for reversal. Pyle v. Kansas City Light & Power Co., 246 S.W. 979, 987 [15] (Mo.App. 1922) [reversed on other grounds, 291 Mo. 532, 237 S.W. 1021 (banc 1922)]. Nor is there any showing that this evidence entered into the Board's determination that the statutory criteria for relocation had been met.

The second evidentiary objection relates to the reception in evidence of the file of the Commissioner of Finance. The variegated contents of the file included pleadings, correspondence, the recommendation of the Bank Examiner, the application for relocation submitted by respondent Southeast Bank and materials in support of that request. Appellant objected that neither the Commissioner nor the Bank Examiner was available for cross-examination on the contents of the file. Although appellant's objection impugns no particular content of the file, the point and argument on appeal are based on § 536.070, RSMo 1969, V.A.M.S. which governs the reception of evidence at contested hearings before administrative agencies, and we understand the complaint to be that as to this exhibit appellant was denied the right of

cross-examination accorded by subsection [11] of that statute. The lack of focus to appellant's complaint clouds assessment of what prejudice could have resulted from the reception of the exhibit as evidence. We consider the contents of the file: the pleadings were matters of judicial notice and thus, in any event, properly before the Board [§ 536.070(6)]; the charts, graphs and maps of the geographic features and banking economics of the proposed location were virtually all otherwise independently introduced at the hearing and cross-examined upon extensively by appellant; the correspondence—letters of transmittal and advice—were innocuous; the report of the Examiner to the Commissioner [except for his recommendations] was largely cumulative of other evidence received, and since on appeal from an order of the Commissioner the Banking Board is charged with an independent determination of the facts for its decision [§§ 361.094 and 536.090, RSMo 1969, V.A.M.S.], the recommendations of the Examiner are neither binding nor advisory.

In State v. Burton, 334 S.W.2d 75 (Mo. 1970), the Public Service Commission at the close of the hearing ordered its staff to make a further investigation and report, but the hearing was never re-opened for cross-examination of the staff's findings. The court disapproved the procedure but could find no prejudice to the rights of appellant because [l.c. 88]:

> [T]he conclusion of the staff was confirmatory of the evidence adduced at the hearing, so the improperly considered report obviously was merely cumulative and did not affect the commission's order, which is amply supported otherwise by substantial evidence contained in the record [citations omitted] as to which appellants had ample opportunity to cross-examine witnesses and test the accuracy of their evidence.

For this same reason, on the facts and argument as appellant presents them, no prejudice appears. Evans v. Farmers Mutual Hail Ins. Co., 240 Mo.App. 748, 217 S.W.2d 705, 711 [9] (1949). Moreover, the Board's order was amply supported by competent and substantial evidence otherwise adduced.

Appellant contends also that the findings of the State Banking Board that the statutory prescriptions of § 362.325(7) for relocation had been met—in that the convenience and needs of the community at the proposed site justified the relocation of respondent Southeast State Bank and that the solvency of neither respondent, appellant, nor of the other banks in the area would be endangered—were clearly contrary to the overwhelming weight of the evidence. It is the sense of appellant's argument that the convenience and needs of the community did not warrant the relocation because the area was already well served by existing banking facilities. This misconceives the rationale of the statute.

The statutory components requiring inquiry by the Commissioner of Finance, upon a request for relocation, into the convenience and needs of the new community and of the solvency of the existing banks were added to the section (then § 7973, R. S.Mo 1939) in 1941.[2] Only one decision since that amendment [Broadway National Bank v. Linwood State Bank, 456 S.W.2d 296 (Mo.1970)] has dealt with a proposed bank relocation under § 362.325(7), but the court was not required to, and did not, define the term "convenience and needs of the new community". The only extensive consideration of that criterion has been in cases dealing with new bank charters under § 362.030(1). Under that section, when a charter for a new bank is requested, the Commissioner must inquire into the same convenience and solvency elements prescribed for relocation by § 362.325. The "convenience and needs" standard was added to both sections, in virtually identical language, by the Banking Act of 1941. This statutory component has been con-

---

2.  Laws 1941, p. 670.

strued by this Court in a manner contrary to appellant's contention in Suburban Bank of Kansas City v. Jackson County State Bank, 330 S.W.2d 183, 187 [2] (Mo.App. 1959):

> The purpose [of the clause "convenience and needs of the community" in the banking statute] is not to prevent new banks from entering the field, but rather to insure the existence of a healthy banking system. *This is true, even though existing banks have been rendering adequate service.*

■ This assessment of statutory purpose was adopted in Central Bank of Clayton v. State Banking Board, 509 S.W.2d 175 (Mo.App.1974). The opinion establishes authoritatively that the Banking Act of 1941, a sequel to the calamitous bank failures which marked the Great Depression, was enacted to control new entry into the existing banking business by requiring demonstration to a regulatory board that such a facility met a public need and would not impair the solvency of existing banks. The Banking Act of 1941 rejected both state monopoly or regulated private monopoly as cure for banking ills, but reaffirmed the competitive, free-enterprise theory of economy. The court then construed the term "convenience and needs" within this historical matrix, both as to the depository and credit functions of banks:

> [W]ith regard to the depository functions performed by banks, the objectives sought to be obtained by enactment of the "convenience and needs of the community" amendment to the bank chartering act are rather narrow. The plain purpose of the amendment is *to protect the public* against *excessive* competition in the local banking business and against imprudent banking business practices, where either of these conditions could lead to bank failures or unsafe banking. The goal is a healthy banking system. *The amendment does not contemplate preventing new banks from entering a market because existing banks are ren-*

*dering adequate service.* Suburban Bank of Kansas City v. Jackson County State Bank, supra, [Mo.App.] 330 S.W.2d [183] at 187; Stokes, "Public Convenience and Advantage in Applications for New Banks and Branches," 74 Banking Law Journal 921, 929 (1957). The primary protection afforded by the amendment is extended to the public, not to existing banks. (Second emphasis supplied)

> [W]ith regard to lending and other credit functions of banks, the purpose of the "convenience and needs of the community" amendment of the bank chartering act is to promote competition in the public interest among banks, to favor bank entry which will stimulate that competition consonant with prudent banking practices and bank safety, and to discourage monopoly in the lending field. *The protection afforded by the amendment in this regard is again extended to the public.* The goal is to provide the public, where possible, with a reasonable number of local borrowing and credit alternatives so that competition for the public's business, the greatest possible efficiency in the banking business, and economic benefit to the public will result. (Emphasis supplied)

Thus, the legislative desideratum which "convenience and means" is meant to accomplish is the public protection and not the advantage of established banking houses, so that proof that adequate services are already available in the community does not foreclose a grant of authority for another bank to relocate there.

■ The appellant contends also that the finding of the State Banking Board that the probable volume of business in the proposed location is, and will in the future be, sufficient to insure and maintain the solvency of the Southeast State Bank, appellant and other existing banks in the community [the other prerequisite for relocation under § 362.325(7)] was clearly contrary to the overwhelming weight of

the evidence. The parties gave conflicting evidence on this issue, but a resume is neither necessary nor instructive. It is sufficient to say that respondent Southeast State Bank's expert predicted substantial future residential and commercial growth in the relocation area, while it was appellant's evidence that the solvency of Southeast Bank would depend upon deposits already in or destined for Blue Ridge Bank and other banks sited in the area. We are required to view the record in the light most favorable to the findings of the Board [St. Louis County v. State Tax Commission, 406 S.W.2d 644, 649 [5] (Mo. banc 1966)] and determine only whether the administrative action was unlawful, arbitrary, an abuse of discretion, or not supported by competent and substantial evidence upon the whole record. § 536.140, RSMo 1969, V.A.M.S.; Tom Boy, Inc. v. Quinn, 431 S.W.2d 221, 225 [1] (Mo. banc 1968). In view of the testimony of appellant's own expert that its solvency would not be jeopardized by the relocation of Southeast State Bank into the service area, there can hardly be cavil at the finding of the State Banking Board that the statutory solvency requirement had been met.

We have treated the conclusions of the Banking Board on "convenience and needs" and "solvency" as disparate findings in order to facilitate response to appellant's contentions which raise them as independent grounds of error, but these statutory components are only artificially divisible. While, in the absolute sense, it may be irrelevant on the issue of convenience and needs of the new community for a bank relocation that adequate services are already available, if that intrusion threatens the solvency of the existing banks, and thus the public interest in banking safety, the relocation cannot be justified under § 362.325(7). Indeed, the requirement of the statute for a determination by the Commissioner "whether the probable volume of business at the new location is sufficient to insure and maintain the solvency [of the relocated and existing banks in the new community]" does not prescribe an independent finding, but only a consideration implicit in the convenience and needs finding. The import of the identical substantive language of § 362.030(1) [for new bank charters] was explained in Marshfield Community Bank v. State Banking Board, 496 S.W.2d 17 (Mo. App.1973), l.c. 21, n. 2:

[I]t could hardly be said that a new bank would serve the convenience and needs of its prospective trade territory if its opening endangered the solvency of the area's established banks or uselessly impeded their opportunities for expanded service—and especially so if its competitive activities were likely to be conducted at risk of its own solvency and hence at hazard to the public.

It is the final contention of appellant that § 362.325(7), which allows relocation of a bank for the convenience and needs of the community, implies a corollary that relocation shall be denied a bank from a community whose convenience and needs justify its retention, and since it was undisputed that a bank was needed in the densely populated area presently served by Southeast State Bank, the denial of these services to residents of that area was arbitrary, capricious, unreasonable and an abuse of discretion by the Board. The assertion of the corollary is inconsistent with the very language of the statute. When a bank proposes relocation under § 362.325(7), an investigation must be made of the convenience and needs of the relocation community and the effect of the move on bank solvency,

[A]nd, if the commissioner, as a result of the examination, be not *satisfied in the particulars mentioned or either of them*, he may refuse to issue the certificate applied for. (Emphasis supplied)

The interpolation of § 362.325(7) to imply the corollary would allow the Commissioner and the Board a discretion the statutory language does not permit nor imply by ne-

cessity and would create a right in the community of original location which, on the face of the statute, does not appear. Sayles v. Kansas City Structural Steel Co., 344 Mo. 756, 128 S.W.2d 1046, 1051 *[7–9]* (banc 1939).

The judgment is affirmed.

All concur.